IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| P.P., a minor by and through his parents, | : | CIVIL ACTION |
| MICHAEL and RITA P., and | : | |
| MICHAEL and RITA P., | : | NO. 06-4338 |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| WEST CHESTER AREA SCHOOL | : | |
| DISTRICT, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

Giles, J.                                                                                     May 29, 2008

**I. INTRODUCTION**

P.P., a minor child, and his parents (collectively, "Plaintiffs") initiated this case against

Defendant West Chester Area School District based on claims arising under the Individuals with

Disabilities Education Act ("IDEA"), as amended, 20 U.S.C. § 1400 et seq. (2007), Section 504

of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 (2007), and Section 1983 of

the Civil Rights Act ("Section 1983"), 42 U.S.C. § 1983 (2007).  This matter is before the Court

on the parties' cross-motions for judgment on the administrative record and Defendant's Motion

for Summary Judgment (Docket Nos. 15 & 17) and all responses and replies thereto.

For the reasons that follow, the court denies Plaintiffs' motion, grants Defendant's

motions, and enters judgment in favor of Defendant on all Plaintiffs' claims.

**II. BACKGROUND**

At the time of filing of the Complaint in this case, P.P. was eleven years old and resided

in the West Chester Area School District.  (Compl. ¶ 2.)  He had been educated exclusively outside the public school system, at St. Maximillan Kolbe ("St. Max") parochial school from Kindergarten through third grade, then at the Benchmark School ("Benchmark"), a private school for children with disabilities, beginning the summer before his fourth grade year.  (Admin. R., Ex. 8, Due Process Hearing Decision, June 30, 2006 ("D.P. Decision"), 3, 11.)

After a number of communications with the District regarding P.P.'s educational needs, the Parents sought a due process hearing, seeking compensatory education, reimbursement for independent educational evaluations ("IEEs") and vision therapy services, and tuition reimbursement for a Benchmark summer program and school year.  (D.P. Decision 3.)[1]

A hearing was held over six days between November 2005 and May 2006.  (D.P. Decision 1.)  The hearing addressed the following issues:

> 1.  whether the District is required to provide compensatory education services to P.P. for school years 2002-03, 2003-04, and 2004-05 for failing in its Child Find obligation and/or for failing to timely evaluate P.P.;
>
> 2.  whether the District is required to reimburse Parents for expenditures incurred to obtain vision therapy for Patrick from July 2003 through March 2004;
>
> 3.  whether the District is required to reimburse Parents for an IEE conducted in April 2003 when P.P. was in first grade  and/or an IEE conducted in December 2004, when Patrick was in third grade;
>
> 4.  whether the District is required to reimburse Parents for their expenditures for Patrick's summer programming for the summer of 2005; and

---

[1] Four days before the first session of the hearing, the U.S. Supreme Court handed down its ruling in Shaffer v. Weast, 546 U.S. 49 (2005), placing the burden of proof in an administrative hearing challenging an IEP upon the parents.  Although, prior to the hearing, the Hearing Officer had ruled that the District would bear the burden of production, the Hearing Officer reversed her ruling on the first day of the hearing, assigning the burden of production to Plaintiffs.

5.      whether the District is required to reimburse Parents for tuition at the parochial school in which they unilaterally placed Patrick for the 2005-06 school year, based on their assertion that the District conducted an inappropriate evaluation and produced an inappropriate independent education plan ("IEP").

(D.P. Decision 3.)

The Hearing Officer released her decision on June 30, 2006, and ordered the following:

1.      the District did not fail in its Child Find obligation;

2.      the District is not required to provide compensatory education services to P.P. from October 5, 2003, through May 3, 2005;

3.      the District did fail to evaluate P.P. in a timely manner, and the length of time it took from the written parental request for an evaluation to completed evaluation report was a significant procedural violation;

4.      the District is required to provide compensatory education services to P.P. from May 4, 2005, through June 21, 2005;

5.      the District is not required to reimburse Parents for expenditures incurred to obtain vision therapy for P.P. from July 2003 through March 2004;

6.      the District is not required to reimburse Parents for the IEEs conducted in April 2003, December 2004, and February 2005;

7.      the District is not required to reimburse Parents for their expenditures for programming for P.P. in the summer of 2005;

8.      the District conducted an appropriate evaluation of, and offered an appropriate IEP for P.P., and therefore is not required to reimburse P.P. for tuition for the 2005-2006 school year at the unilaterally selected parochial school.

(D.P. Decision 27.)  Both parties filed exceptions to the Hearing Officer's decision, seeking an

appeal to the Appeals Panel.  The Appeals Panel issued its decision on August 17, 2006.

(Admin. R., Ex. 2, In Re P.P., Pa. SEA No. 1757 ("Appeals Panel Decision").)  The Appeals

Panel affirmed almost all of the Hearing Officer's findings, but the Panel held that P.P. is not entitled to compensatory education for the period when he was enrolled in parochial school. (Appeals Panel Decision 20.)

On September 28, 2006, Plaintiffs filed their Complaint against the District pursuant to IDEA, Section 504, and Section 1983.  Both parties now move for judgment on the administrative record.  Defendant moves for summary judgment, seeking affirmation of the Appeals Panel Decision.  On the other hand, Plaintiffs seek the following:

1.    full days of compensatory education from the 2002-03 school year through the end of the 2004-05 school year, inclusive of summers;

2.    appropriate tuition reimbursement relief for P.P.'s placement at Benchmark for the 2005-06 school year, or, in the alternative, full days of compensatory education for each school day during the 2005-06 school year;

3.    reimbursement for P.P.'s tuition at Benchmark during the Summer of 2005;

4.    reimbursement for the IEEs that Parents obtained privately the 2002-03 and the 2005-06 school years;[2]

5.    reimbursement for vision therapy services that Parents obtained privately from July 2003 through March 2004.[3]

---

[2] In their list of requested relief in their Memorandum in Support of their Motion for Judgment on the Administrative Record, Plaintiffs do not include reimbursement for the IEEE they obtained during the 2002-03 school year.  However, their Complaint states that they seek reimbursement for two privately obtained IEEs.  (Compl. ¶1.)

[3] Plaintiffs' Memorandum in Support of Judgment on the Administrative Record states that Plaintiffs obtained these services in March 2003.  (Pls.' Mem. in Supp. of Mot. for J. on the Admin. R. 34.)  All other documents in the record show that they obtained vision therapy services from July 2003 through March 2004.  (See, e.g., D.P. Decision at 3 (stating that one of the issues to be decided at the hearing is whether the District must reimburse Plaintiffs for vision therapy services that they obtained privately from July 2003 through March 2004).)

6.       appropriate monetary relief for the District's alleged violations of IDEA, Section 504, and Section 1983;

7.       attorneys' fees and costs; and

8.       any other relief the Court deems fair, equitable and just.

(Pls.' Mem. in Supp. of Mot. for J. on the Admin. R. 34-35.)[4]

This court affirms the Appeals Panel Decision, in its entirety, thereby granting Defendant's motion and denying Plaintiffs' motion.

### III. STANDARD OF REVIEW

Under the IDEA, "any action brought . . . (I) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(B) (2007).  In reviewing an administrative adjudication of an IDEA dispute, the court must give "due weight" to the factual findings of the state administrative proceedings.  See Board of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). The Third Circuit has interpreted the "due weight" standard as requiring district courts to conduct a "modified de novo" review of administrative judgments below.  S.H. v. State-Operated Sch. Dist., 336 F.3d 260, 270 (3d Cir. 2003) (citations omitted).  Under this standard, factual findings from the administrative proceedings are to be considered prima facie correct, and if a reviewing court fails to adhere to the administrative findings, it is obliged to explain why.  Id.  When reviewing an administrative decision in a Pennsylvania IDEA case, a federal district court is

---

[4] Although Plaintiffs initially sought compensatory damages through their Complaint, they have effectively withdrawn claims for compensatory damages under the IDEA, Section 504, or Section 1983.  (See Pls.' Mot. for J. on the Admin. R. 2, n.1.)

"required to defer to the [hearing officer's] factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." Id. (citing Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995)); see also Lauren W. v. Deflaminis, 480 F.3d 259, 266 (3d Cir. 2007) (noting with approval that the district court deferred to the hearing officer's credibility determinations). "Moreover, the court must explain why it does not accept the ALJ's findings of fact to avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews." Id. (internal quotation and citations omitted).

"A district court should [ ] give due weight to the appeals panel's decision when it reverses the hearing officer's conclusions of law, inferences from proven facts, and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995).

## IV. FACTS

The following facts were found by the Hearing Officer in the June 30, 2006, decision. (See D.P. Decision 3-11, Findings of Fact (hereinafter "F.F.").) Prior to the hearing, the Hearing Officer determined that, while she would limit any recovery to the period from October 5, 2003, through October 5, 2005, she would allow Plaintiffs to present evidence from September 2002 through October 4, 2003, in the event that an appellate body might choose to consider that period. (D.P. Decision 2.)

At the time of the due process hearing, P.P. was ten years old and had been educated exclusively outside the public school system. (F.F. 1, 2.) He attended St. Maximillian Kolbe parochial school ("St. Max") from kindergarten through third grade. (F.F. 3.) He had difficulties

with pre-reading skills as early as kindergarten.  (F.F. 5.)  The Parents claim that they had had a telephone conversation with a district psychologist in February 2003 and that they made a written request for a evaluation from the District in March 2003.  (F.F. 6.)  However, they did not call or subpoena the psychologist as a witness and could not produce a copy of a letter.  (F.F. 6.)  Moreover, P.P.'s mother testified that she did not follow up on her letter to the District and recounted no further contact with the District until early November 2004.  (F.F. 7.)  Additionally, the St. Max guidance counselor responsible for facilitating referrals for testing through the District recalled informing the Parents about the process for obtaining an evaluation, and produced her notes relative to her conversations with the family during the 2002-03 school year, but did not recall receiving a copy of a letter or completed parent input from the Parents, nor could she  recall delivering any information regarding P.P. to the District.  (F.F. 8.)  The school psychologist who handled all evaluation referrals for students residing in the Westtown Thornbury Elementary School boundaries, and who was found to maintain an extraordinary thorough and meticulous record-keeping system, had no record of any conversation with the Parents or any documentation regarding P.P..  (F.F. 10.)

In April 2003, during P.P.'s first grade year, the Parents obtained a private IEE from Dr. Tracey Daniel Burke ("the 2003 IEE").  (F.F. 11.)  In the 2003 IEE, Dr. Burke found P.P. to have above average verbal intelligence and low average to average perceptual organizational skills. She opined that "a delay in P.P.'s visual-motor integration skills and fine motor coordination skills is having a negative impact on the development of his reading and writing abilities."  (F.F. 12.)  Dr. Burke also recommended that P.P. work with a reading specialist or tutor and with an occupational therapist to address fine motor skills.  (F.F. 13.)

On November 22, 2004, the Parents sent a letter to the District, requesting an evaluation of P.P. and noting difficulties in reading and writing.  (F.F. 19.)  As of that time, they had scheduled an IEE with Dr. Lisi Levisohn, also privately retained, for December 14, 2004 ("the 2005 IEE").[5] In their November 22 letter, the Parents made the District aware of the imminent Levisohn evaluation and they indicated that there was a "strong possibility" that they would need to enroll P.P. in public school for the 2005-06 school year.  (F.F. 20-21.)  Susan Amsterdam, District psychologist and representative of the District in all matters pertaining to P.P.'s evaluation, interpreted this letter to be a request by the Parents for an evaluation by the District of P.P.'s special education eligibility.  (F.F. 22.)  When the District receives such a request, rather than issue a Permission to Evaluate form, its practice is to make a referral of the child to its Child Study Team, which seeks further information from the child's parent and requests that the parent sign release of information forms.  (F.F. 23.)  On November 29, 2004, the District sent a Release of Records form and a Parent Input Form to the Parents.  The Parents filled out, signed, and returned these forms to the District, attaching a copy of the 2003 IEE performed by Dr. Burke. They informed the District that an IEE with Dr. Levisohn was scheduled for December 14, 2004. (F.F. 25, 27.)

On December 17, 2004, the District sent copies of the releases to St. Max's guidance counselor and to Dr. Levisohn.  (F.F. 28.)  The District told the Parents that an information gathering process would precede issuance of a Permission to Evaluate Form and that receipt of a

---

[5] Dr. Levisohn's evaluation of P.P. for the 2005 IEE was conducted on three days in December 2004 and February 2005, and she completed her evaluation report on April 5, 2005. (Admin. R., Ex. 18, S-7: Dr. Lisi Levisohn, Report of Neuro-Developmental Psychoeducational Evaluation, April 5, 2005, 1.)

signed Permission to Evaluate Form would trigger the start of the regulatory timelines for completion of the evaluation.  (F.F. 29.)  The District convened a Child Study Team in mid to late January to review the information.  (F.F. 32.)

Ms. Amsterdam from the District described the next step as, "[I]f we feel at that time that that child should be evaluated, then a Permission to Evaluate is issued."  (F.F. 32.)  She also testified that, "if the team does not believe that a permission to evaluate should be issued, then we should do a Notice of Recommended Educational Placement if we, as a team, believe that the child should not be tested at that time."  (F.F. 35.)

On February 2, 2005, the District did mail to the Parents a Permission to Evaluate form, dated January 28, 2005.  (F.F. 36.)  The form was mailed 72 calendar days from the date of the Parents' letter that the District has interpreted as a request for an evaluation.  (F.F. 36.)  After learning that some of the evaluation measures that the District proposed to use were being administered by Dr. Levisohn, Ms. Amsterdam advised the Parents not to sign this Permission form since it needed to be amended.  (F.F. 38.)  The Parents did not sign the form.  (F.F. 38.)  Ms. Amsterdam assured them that it would not take long for her to send out a new form.  (F.F. 38.)  On or about February 21, 2005, Dr. Levisohn sent to the District psychologist a list of the measures she had used, noting that her report was still in progress.  (F.F. 39.)  Despite knowing that Dr. Levisohn anticipated not using certain tests, Ms. Amsterdam and her supervisor decided that a new Permission to Evaluate form should not be issued until the District had Dr. Levisohn's final report in hand.  (F.F. 40.)  Ms. Amsterdam testified that she had decided to wait "to see the final results of the independent evaluation, to see what additional things needed to be done." (F.F. 41.)  The Parents were not asked to wait for Dr. Levisohn's IEE results before signing a

new Permission to Evaluate form.  (F.F. 40.)  After reviewing Dr. Levisohn's 2005 IEE report, dated April 5, 2005, the District sent a revised Permission to Evaluate Form, dated April 7, 2005. (F.F. 42.)  The Parents signed the form on April 11, 2005.  (F.F. 42.)  This second form was issued 64 days after the first form was mailed.  (F.F. 42.)

The Hearing Officer found that, once all school and/or provider information is received, the District takes it to the Child Study Team, which discusses the case.  (F.F. 30.)  The District received information from St. Max in early January and convened a child study team in mid to late January.  (F.F. 31-32.)  According to Ms. Amsterdam, once a parent has signed a Permission to Evaluate Form, the District has 60 school days within which to complete an evaluation.  (F.F. 30.)[6]

Dr. Levisohn opined that P.P. qualified for special education under the classifications of Learning Disabled and Mentally Gifted.  (F.F. 43.)  The District did not challenge any of Dr. Levisohn's testing assessments, interpretations, impressions, or recommendations.  (F.F. 44.)

Testing by the District began in early June 2005.  (F.F. 45.)  The Parents enrolled P.P. in the District the day that testing began.  (F.F. 45.)  At the time of enrollment, a District representative told the Parents that there would be a summer IEP meeting in July.  (F.F. 46.) However, in mid-July she called and reported that there could not be a summer meeting because all necessary parties could not be convened.  (F.F. 46.)

Following Dr. Levisohn's advice, P.P.'s mother had visited the Benchmark School on or

---

[6] Ms. Amsterdam testified that she knew of no timelines within which the District was obligated to issue a Permission to Evaluate Form following a parental request for an evaluation, but she eventually conceded that the form must be issued within a "reasonable time."  (F.F. 30. 34.)  She opined that that reasonable time should be within 10 days of the written request for an evaluation.  (F.F. 34.)

about March 7, 2005.  (F.F. 64.)  The Parents had had a positive impression of that school and

had applied for admission.  (F.F. 65.)  In order to qualify for Fall admission, all students must

attend a five-week summer program where they would be evaluated for their appropriateness for

Benchmark's regular school year program.  (F.F. 69.)  In late May or early June 2005, P.P. was

accepted for admission to Benchmark for the summer program and prospectively for the coming

school year.  (F.F. 71.)  In order to secure a place for P.P. in Benchmark for the Fall, the Parents

sent a deposit to Benchmark in early June since they remained unsure as to what the District was

going to offer and they had come to the conclusion that St. Max was no longer appropriate for

their child.  (F.F. 74.)

Upon completion of its testing of P.P., the District produced an Evaluation Report (ER)

and provided a preliminary copy to the family in July 2005.  (F.F. 47.)  The ER was finalized and

re-sent to the Parents on September 1, 2005.  (F.F. 47.)  It concluded that P.P. had a specific

learning disability in the areas of reading and written expression and additionally noted a need for

occupational therapy.  (F.F. 48.)  The ER incorporated much of Dr. Levisohn's IEE report,

though it recommended occupational therapy although Dr. Levisohn had not.  (F.F. 48.)  On

August 19, 2005, the Parents wrote to the District noting that they were not in agreement with the

ER because it did not identify P.P. as having a specific learning disability in math computation

and because no assessments of social and emotional functioning were performed.  (F.F. 49.)[7]  On

---

[7] P.P. became dizzy during the math portion of the Levisohn evaluation, and although he
was not familiar with some of the types of problems on the test instrument, he still received
standard scores in the low average to average range, and there were no indications that he was
doing poorly in math at his program at St. Max.  (F.F. 50.)  The District did not conduct
social/emotional assessments because the Parents reported P.P. to be social, happy, and
responsible; Dr. Levisohn found him to be "incredibly" pleasant, joyful, and interpersonally and
intellectually engaging; and his teachers described him as motivated, positive, and behaving

or about that date, Parents also notified the District by letter that, because its ER was not

finalized and they were told that P.P. would not be offered an IEP until after the school year

began, they "had no alternative but to find a placement for him that will address his educational

needs" and that they were enrolling P.P. at Benchmark for 2005-06 and were demanding that the

District fund the placement.  (F.F. 52.)[8]

      Aware that there are few exceptions to the 10-month June through March payment cycle,

the Parents began paying tuition in June for P.P.'s attendance in the fall program at Benchmark.

(F.F. 75.)  They unilaterally placed P.P. in the Benchmark summer program during the summer

of 2005, prior to receiving the District's evaluation report, and they unilaterally placed him in the

Benchmark program for the 2005-06 school year.  (F.F. 76-77.)  At the time of the due process

hearing, P.P. had not been provided vision services or gifted services at Benchmark.  (F.F. 63,

79.)

      The District's 2005-06 school year began on September 6, 2005.  (F.F. 53.)  On

September 8 or 9 the Parents received a District invitation to participate in an IEP meeting on

September 13.  (F.F. 53.)   At the IEP, the Parents signed and noted agreement with the slightly

revised District ER.  (F.F. 53.)  The resulting District IEP addressed annual goals and short term

objectives in reading, written expression, math computation, fine motor skills (pencil grasp), and

visual-motor coordination.  (F.F. 54.)  It also contained a provision for P.P. to learn keyboard

skills; it addressed spelling; it noted that P.P. qualifies for enrollment in the mentally gifted

appropriately.  (F.F. 51.)

    [8] F.F. 49 notes that Parents wrote to the District on August 19, 2005.  F.F. 52 addresses
the Parents' "August 18, 2005 letter," though the hearing officer made no prior reference to an
August 18, 2005, letter.

program; and it contained an extensive list of well-thought-out specially designed instruction that addressed P.P.'s learning needs.  (F.F. 55-57, 59.)  The District's IEP noted that P.P. was not eligible for Extended School Year, but his eligibility would be monitored for the summer following 2005-06.  (F.F. 58.)  The Parents did not approve the IEP.  (F.F. 60.)  A November 15, 2005, revised District IEP included recommendations for vision support services.  (F.F. 63.)

The District engages in extensive Child Find activities, including annual notices in a general circulation newspaper in the District.  (F.F. 14.)  The notices inform parents about the availability of evaluations, that requests for an evaluation must be in writing and cannot begin without written consent, that there are timelines for requesting due process, and whom to contact for further information.  (F.F. 14.)  The same information is provided on public access television.  (F.F. 14.)  Additionally, there are posters and pamphlets posted in District buildings and in private schools within the District that inform parents of what to do in the event that they think their child may need special education.  (F.F. 15.)  The pamphlets also inform parents that written consent is needed for evaluations.  (F.F. 15.)  Information about accessing special education services is sent to resident homeowners in their tax bills and posted on the District's website.  (F.F. 16.)  The District conducts training for principals and counselors of non-public schools regarding referral processes and other Child Find issues, including information that parents must make written requests for an evaluation in order for the process to begin.  (F.F. 17.)  As of the time of P.P.'s due process hearing, at its most recent monitoring review by the Commonwealth, the District had been found to be 100% compliant with Child Find obligations.  (F.F. 18.)

# V.  DISCUSSION

**A.      Section 1983 claims**

Plaintiffs' § 1983 claims against the District are predicated upon violation of rights

secured by the IDEA and § 504 of the Rehabilitation Act.  Last year, the Third Circuit held that

because both the IDEA and the Rehabilitation Act have sufficiently comprehensive remedial

schemes, § 1983 is not available to remedy violations of the rights created by those statutes.

A.W. v. The Jersey City Public Schs., 486 F.3d 791, 803-04, 806 (3d Cir. 2007) (en banc).  The

Third Circuit's decision is based on the Supreme Court's reasoning in City of Rancho Palos

Verdes v. Abrams, 544 U.S. 113 (2005), regarding the availability of § 1983 to redress violations

of federal statutory rights.  The Third Circuit's 2007 ruling in A.W. abrogated its holding in W.B.

v. Matula, 67 F.3d 484 (3d Cir. 1995), that violations of a plaintiff's rights under IDEA and §

504 were actionable under § 1983.  A.W., 486 F.3d at 795.  As there is no genuine issue of

material fact, and because the District is entitled to judgment as a matter of law, this court must

grant summary judgment for the District on Plaintiffs' § 1983 claims.  Id.  See also Ronald E. v.

School Dist. of Philadelphia Bd. of Educ., No. 05-2535, 2007 WL 4225584, at *6 (E.D. Pa.,

Nov.  29, 2007) (holding that parents did not have standing to sue under § 1983 to enforce the

predicate rights secured by IDEA and Section 504).[9]

**B.      IDEA Claims**

**1.      Statute of Limitations**

Parents' IDEA claims were correctly limited to those arising within the two years of their

---

[9] As this district court observed in a prior case, "A.W. is silent as to the matter of its
retroactive application."  Enright v. Springfield Sch. Dist., No. 04-1653, 2007 WL 4570970, at
*4, n.2 (E.D. Pa., Dec. 27, 2007).

October 5, 2005, request for a due process hearing.  In December 2004, Congress amended

the IDEA by adding a new two-year limitation period for parents to request a due

process hearing under IDEA.  The IDEA, as amended, ("IDEA-2004") provides as follows:

> A parent or agency shall request an impartial due process hearing
>
> within 2 years of the date the parent or agency knew or should have
>
> known about the alleged action that forms the basis of the
>
> complaint, or, if the State has an explicit time limitation for
>
> requesting such a hearing under this subchapter, in such time as the
>
> State law allows.

20 U.S.C. § 1415(f)(3)(c) (2007).  The 2004 amendments went into effect on July 1, 2005.

The IDEA-2004 allows two exceptions to the two-year limitations period during which a

parent or agency must request a due process hearing.  The limitation does not apply in cases

where the parent was prevented from requesting a hearing due to either of the following factors:

> (i) specific misrepresentations by the local educational
>
> agency that it had resolved the problem forming the
>
> complaint; or
>
> (ii) the local educational agency's withholding of
>
> information from the parent that was required by this
>
> subchapter to be provided to the parent.

20 U.S.C. § 1415(f)(3)(D) (2007).

Here, Plaintiffs argue that because some of the events giving rise to their claim occurred

prior to the enactment of IDEA-2004, claims about events occurring before October 5, 2003, are

not barred by the two-year statute of limitations.  (Pls.' Mot. For J. on Admin. R. at 11.)[10]  The

parties do agree that the 2004 Amendments to the IDEA have no retroactive application.  See

Lawrence, 417 F.3d at 370 ("amendments to the IDEA have prospective application only").  Yet,

Plaintiffs ask this court to determine which version of the IDEA should apply, based on the date

of the underlying events.  Such is not a correct measure.  A determining factor for the statute of

limitations is clearly written into IDEA-2004.  It is the date Plaintiffs requested their due process

hearing.  See 20 U.S.C. § 1415(f)(3)(c) (2007) ("A parent or agency shall request an impartial

due process hearing within 2 years of the date the parent or agency knew or should have known

about the alleged action that forms the basis of the complaint. . . .") (emphasis added).  Arguably,

it is unclear from the statute whether a district court should determine the version of IDEA to

apply based on the date of the due process request or the date the complaint was filed.[11]

However, this court need not resolve that issue because Plaintiffs in this case requested their due

---

[10] Plaintiffs also argue that the IDEA-2007 does not create a two-year statute of limitations.  (Compl. ¶ 101)  Instead, Plaintiffs aver that the Act establishes two distinct time periods: first, a parent has two years from the time that the parent is aware of the violation to initiate a due process hearing and, second, that the hearing officer must then consider and adjudicate all violations which occurred two years before any date that the District knew or should have known of the violation.  (Pls.' Mot. for J. on the Admin. R. 12-13.)  Plaintiffs cite no authority to support this contention.

[11] In Lawrence Tp. Bd. of Educ. v. New Jersey, 417 F.3d 368, 370 (3d Cir. 2005), the Third Circuit wrote that "the provisions in effect at the time the complaint was filed in 2003 will be applied here," but that case, brought by a school board against the State, did not involve a request for a due process hearing.  In Warren G. v. Cumberland County School District, 190 F.3d 80 (3d Cir. 1999), the Third Circuit declined to apply IDEA's 1997 amendments ("IDEA-1997") regarding tuition reimbursement to a case where the complaint was filed after the effective date of IDEA-1997.  See id. at 86 n.3 ("The District Court held that the amendment did not apply because all of the events in this case occurred prior to the effective date of the amendment, June 4, 1997, and neither party has challenged that ruling. We agree.").  The tuition reimbursement issue, however, is entirely independent of the statute of limitations issue in this case.

process hearing and filed their Complaint after IDEA-2004 went into effect.  Without question, IDEA-2004 applies.  Furthermore, because Plaintiffs requested a due process hearing on October 5, 2005, the Hearing Officer and the Appeals Panel properly barred as untimely claims made prior to October 5, 2003.

### a.    Statutory Exceptions to the Limitations Period

Plaintiffs argue that, even if IDEA-2004 applies to their case, both the enumerated and common law exceptions apply to toll the two-year statute of limitations period.  (Pls.' Mot. For J. on Admin. R. at 10.)  IDEA-2004 sets allows two exceptions to the two-year limitations period to request a due process hearing: (1) where parents were delayed in requesting a hearing because of "specific misrepresentations by the local educational agency that it had resolved the problem forming the complaint;" and (2) because the local educational agency withheld information that was required to be provided to the parent.  20 U.S.C. § 1415 (f)(3)(D) (2007).  As another district court noted, "Any inquiry into the application of the statute of limitations requires a highly factual determination as to . . . whether the parents were prevented from filing a due process complaint due to the alleged misrepresentation of, or the withholding of information by the Defendant."  J.L. v. Ambridge Area Sch. Dist., No. 06-1652, 2008 WL 509230, at *7 (W.D. Pa. Feb. 22, 2008).  Giving due weight to the facts found through the administrative process, Plaintiffs have provided no evidence to indicate that either exception applies to their case.

Plaintiffs allege in their Complaint that the District "routinely and continually" misrepresented information by "providing misleading Child Find notices, discouraging non-public schools from recommending referrals to evaluation, [ ] failing to evaluate Patrick after receiving a written parental request for an evaluation in January 2003 . . . and excessively

delaying [Patrick's] evaluation . . . during the Spring of 2005." (Compl. ¶ 103.) Even liberally construed, Plaintiffs' claims do not allege that the District specifically misrepresented that it had resolved their problem with P.P.'s education, as required by the first exception. The court interprets these allegations as their attempt to invoke the second exception, regarding withholding information. However, this court agrees with the Hearing Officer and the Appeals Panel's conclusion that none of Plaintiffs' evidence triggers application of either statutory exception. (F.F. 17; Appeals Panel at 7.) Despite their allegations, the Hearing Officer and the Appeals Panel found that the District met its Child Find obligations. (F.F. 14-18.) Plaintiffs make no other claims regarding withholding information.[12] Accordingly, because the findings of the administrative process are to be considered prima facie correct and because no non-testimonial extrinsic evidence in the record convinces the court not to adhere to those findings, the court holds that neither statutorily-enumerated exception to the IDEA-2004 limitations period applies to the current case.

### b.    Common Law Doctrines

Judicial precedent shows that the IDEA-2004 limitations period is not tolled by any common law doctrine. Plaintiffs attempts to argue the contrary are unsupported by applicable case law. Plaintiffs contend that IDEA-2004 "clearly recognizes a separate 'continuing violation' principle that tolls the statute of limitations for the entire period during which ongoing violations of IDEA are alleged." (Pls.' Mot. for J. on Admin. R. at 14.) In support of the continuing

---

[12] Plaintiffs claim they made a written request for a District evaluation in March 2003 but that no evaluation was provided. This appears to be a claim of misconduct that does not fit within either of the statutory exceptions to the limitations period. Nonetheless, the Hearing Officer found (and that Appeals Panel agreed) that the Parents could not prove that such a request actually occurred. (See F.F. 6-10.)

violation principle, they primarily rely on a 2005 case from this District, <u>Robert R. v. Marple Newtown Sch. Dist.</u>, No. 05-1282, 2005 WL 3003033 (E.D. Pa. Nov. 8, 2005).  The <u>Robert R.</u> case, however, is inapposite because it does not involve an analysis of claims raised after July 1, 2005, and therefore, does not consider the IDEA-2004 statute of limitations.

Plaintiffs also contend that IDEA-2004 is subject to equitable tolling principles.  To support their argument, Plaintiffs attempt to elicit Congressional intent from various United States Senate Reports printed before the IDEA-2004 was enacted.  (<u>See</u> Pls.' Mot. for J. on Admin. R. 15-18.)  Of note, one of the same Senate Reports, cited in part by Plaintiffs, also states the following: "The bill [ ]provides for exceptions to the timeline [for requesting a hearing] in limited instances.  The Committee does not intend that common law determinations of the statute of limitations override this specific directive."  S. REP. NO. 108-185, at 40 (2003).  Even Plaintiffs' cited source indicates that the only exceptions to IDEA-2004 are those expressly articulated in the statute.  <u>See also</u> <u>J.L. v. Ambridge Area Sch. Dist.</u>, No. 06-1652, 2008 WL 509230, at *7 (W.D. Pa. Feb. 22, 2008) (specifically rejecting an assertion that IDEA-2004's statute of limitations may be tolled by common law doctrines).

## C.   Section 504 Claims.

### 1.   Pennsylvania Personal Injury Statute's Two-Year Limitation Period Applies to Plaintiffs' Section 504 Claims

Plaintiffs have raised claims under Section 504 of the Rehabilitation Act, which does not specify a statute of limitations.  Defendant contends that IDEA-2004 provides a closer analogy to Section 504 than any state statute and that the Court must borrow IDEA-2004's two-year limitations period.  (Def.'s Mot. for Disposition on the Admin. R. & Summ. J. 20-21.)  Plaintiffs,

on the other hand, contend that Section 504 has historically borrowed state tort limitations periods, including state minority tolling principles, the continuing violation doctrine, and equitable tolling.  (Pls.' Mot. for Disposition on the Admin. R. 11.)  The court concludes that Pennsylvania's personal injury limitation period of two years applies to Plaintiffs Section 504 claims.

When a federal statute does not include an express statute of limitations, the general rule is that a court must "apply the most closely analogous statute of limitations under state law." DelCostello v. Int'l Bhd. of the Teamsters v. United Steel Workers of Am., 462 U.S. 151, 158 (1983).  "In some circumstances, however, state statutes of limitations can be unsatisfactory vehicles for the enforcement of federal law.  In those instances, it may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law."  Id. at 161.  A court may borrow a limitations period from an analogous federal law where a federal statute "clearly provides a closer analogy than the available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking."  Id. at 172; United Steel Workers of Am. v. Crown Cork & Seal Co., 32 F.3d 53, 56-57 (3d Cir. 1994). Where there is an analogy between the federal statute and the state statute, and where there is no conflict between the practicalities of litigating the federal claim under the state personal injury limitations periods, courts are bound to borrow state personal injury statutes absent some compelling demonstration that a federal limitations period is significantly more appropriate. Reed v. United Transp. Union, 488 U.S. 319, 327 (1989).

The Third Circuit has "repeatedly [] recognized [its] duty to take seriously the Supreme

Court's admonition that analogous state statutes of limitations are to be used unless they frustrate or significantly interfere with federal policies." United Steel Workers of Am. v. Crown Cork & Seal Co., 32 F.3d 53, 57 (3d Cir. 1994) (quoting Reed v. United Transp. Union, 488 U.S. 319, 324 (1989)).  Thus, the exception to the rule is "closely circumscribed." Id.  Therefore, the question for a court is not whether the IDEA limitation or the state personal injury limitation is more appropriate.  Rather, the question is whether the most analogous state statute – here, the personal injury statute – is clearly inappropriate.  The court concludes it is not.

No precedential Third Circuit opinion has addressed this Section 504 statute of limitations question, but in a non-precedential opinion, a Third Circuit panel approved a district court ruling that applied Pennsylvania's two-year personal injury statute of limitations to Rehabilitation Act claims.  DiFrancesco v. Aramark Corp., No. 05-2026, 169 F. App'x 127, 129 (3d Cir., Mar. 1, 2006) ("The parties do not dispute that DiFrancesco's Rehabilitation Act claim was subject to a two-year statute of limitations that ran out between the filing of his complaint and the dismissal.") (citing Barclay v. Amtrak, 343 F.Supp.2d 429 (E.D. PA. 2004) for its ruling that borrowed Pennsylvania's two-year statute of limitations for Rehabilitation Act claim).  Prior to the effective date of IDEA-2004, Pennsylvania courts consistently borrowed the state personal injury statute of limitations to adjudicate cases involving Section 504 claims.  See, e.g., Toney v. U.S. Healthcare, Inc., 840 F.Supp. 357 (E.D. Pa. 1993), aff'd, 37 F.3d 1489 (3d Cir. 1994); Smith v. City of Phila., 345 F.Supp. 2d 482 (E.D. Pa. 2004); Barclay v. Amtrak, 343 F. Supp. 2d 429 (E.D. Pa. 2004).  In addition, other federal circuit courts have consistently borrowed the statute of limitations periods from state laws.  See, e.g., Everett v. Cobb County School Dist., 138 F.3d 1407, 1409 (11th Cir. 1998) ("most circuits that have adopted a statute of limitations for

ADA or Rehabilitation Act claims have looked to the state's limitations period for personal injury actions."); <u>Morse v. University of Vermont</u>, 973 F.2d 122, 127 (2d Cir. 1992) ("we now hold that actions under § 504 of the Rehabilitation Act are governed by the state statute of limitations applicable to personal injury actions"); <u>Wolsky v. Medical College of Hampton Roads</u>, 1 F.3d 222, 225 (4th Cir.1993) (applying the statute of limitations contained in Virginia's state anti-discrimination statute that was identical to the federal Rehabilitation Act rather than applying the state personal injury statute of limitations).

In deciding whether to apply a federal statute of limitations, a court also must consider whether the federal policies at stake and the practicalities of litigation make the IDEA statute "a significantly more appropriate vehicle for interstitial lawmaking" than the state statute. <u>DelCostello</u>, 462 U.S. at 172.  That is not the case here.  Although limitations periods may vary among states if courts apply the most analogous state statutes, such a variance is contemplated by IDEA-2004.  The statute allows for a state to spell out explicitly its own time limitation for requesting a due process hearing under Section 504.  20 U.S.C. § 1415(f)(3)(c) (2007) ("A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.").  Therefore, no uniformity concerns exist here. <u>See</u> <u>Crown Cork</u>, 32 F.3d at 59-60 ("The need for uniformity becomes real only when the federal statute at issue contains numerous types of claims and legal theories or when the prospect of multiple state statutes of limitation presents serious practical problems.").

Though the District concedes that, prior to the effective date of IDEA-2004, courts in

Pennsylvania applied the state personal injury statute of limitations to Section 504 claims, it

argues that the applicable statute of limitations should change now that IDEA-2004 contains an

explicit statute of limitations.  (Def.'s Mot. for Disposition on the Admin. R. & Summ J. 21.)

The court disagrees and finds that the most closely analogous state statute of limitations applies

to Plaintiffs' Section 504 claims: Pennsylvania's two-year personal injury limitations period.  In

so holding, the court observes that applying IDEA-2004's statute of limitations would also result

in limiting Plaintiffs' recovery to claims that arose within two years of their request for a due

process hearing.

        **2.      No Tolling of the Limitations Period is Warranted.**

        Plaintiffs contend that, since Pennsylvania's two-year statute of limitations for personal

injury claims governs their claims under Section 504, the court must also apply any relevant state

tolling principles, unless they conflict with federal law.  Although Plaintiffs assert that equitable

tolling and continuing violation principles are "clearly recognized" under Section 504 claims,

(Pls.' Mot. for Disposition on the Admin. R. 11), they do not offer any controlling authority in

support of the contention.  Moreover, Plaintiffs' Motion references no factual allegation to

support tolling.  Nonetheless, the court has scoured the allegations in the Complaint and in the

administrative record for any justification for tolling.  The Complaint does set forth a series of

events that allegedly amount to Child Find violations between 2003 and 2005.  (Compl. ¶¶ 45,

57-65, 69-74.)  As it must, the court gives due weight to the factual findings of the Hearing

Officer and the Appeals Panel, and the court finds that the District complied with Child Find

obligations and that the "Parents failed to establish that the District had any knowledge

whatsoever of Patrick and his potential need for special education services at any point prior to

their written evaluation request of November 22, 2004." (D.P. Decision at 13.) Because the court has found no Child Find violation, there can be no continuing violation to warrant tolling of the limitations period.

Moreover, the circumstances of this case do not call for equitable tolling. The Third Circuit has found that tolling principles are applicable "only when the principle of equity would make the rigid application of a limitation period unfair . . . [which generally] will occur when the petitioner has in some extraordinary way been prevented from asserting his or her rights. Miller v. New Jersey Dept. of Corr., 145 F.3d 616, 618 (3d Cir. 1998). The Third Circuit has found extraordinary circumstances warranting equitable tolling in three circumstances: (1) if the defendant actively misleads the plaintiff; (2) if the plaintiff has in some extraordinary way been prevented from asserting his rights; or (3) if a plaintiff has timely asserted his rights mistakenly in the wrong forum. Id. (citing Jones v. Morton, 195 F.3d 153, 159 (3d Cir. 1999)). None of such circumstances existed here.

Plaintiffs also argue that the Pennsylvania minority tolling principle applies to toll the two-year statute of limitations on Plaintiff's Section 504 claims. (See Pls.' Mot. for J. of Admin. R. 16-18.) Plaintiffs' argument for minority tolling could only apply to P.P.'s claims on his own behalf – not to the Parents' claims on his behalf. Pennsylvania's minority tolling statute provides,

> If an individual entitled to bring a civil action is an unemancipated
>
> minor at the time the cause of action accrues, the period of
>
> minority shall not be deemed a portion of the time period within
>
> which the action must be commenced. Such person shall have the

same time for commencing an action after attaining majority as is

allowed to others by the provisions of this subchapter.

42 Pa. C.S.A. § 5533.  Under Pennsylvania law, personal injury to a minor gives rise to two

separate and distinct causes of action: one to the parents' claim on behalf of the minor, and the

other to the minor's claim for losses after minority.  Bowmaster v. Clair, 933 A.2d 86, 88 (Pa.

Super. 2007) (finding that because parents did not assert a claim on behalf of their minor during

the applicable time period, their claims were time-barred).  Although parents may pursue their

claims while the child's claim is barred due to minority, the claims of the parents are not

derivative of their child's claim and may be barred while the child's is still assertable.  Id. at 88,

89 (citing Hathi v. Kewstown Park Apartments, 561 A.2d 1261, 1262 (1989) (holding that

parents were not entitled to use infancy tolling provisions and that the statute of limitations

barred their claims); see also Fancsali v. Univ. Health Ctr. of Pittsburgh, 761 A.2d 1159 (2000)

(holding that, although the statute of limitations ran on the parents' action, the child could bring

action after majority was reached).

The court need not consider whether Pennsylvania's minority tolling statute applies to

this case because P.P. is still a minor and has not asserted claims on his own behalf.

**D.     Child Find Claims**

The court has concluded that a two-year statute of limitations governs Plaintiffs' claims

under IDEA and Section 504.  Although Plaintiffs assert that no statute of limitations applies to

complaints of Child Find violations, (Pls.' Mot. for J. on Admin. Rec. 10)[13], no controlling case

---

[13] In support of this position, Plaintiffs cite In re the Educational Assignment of C.B.,
Special Education Opinion No. 1637.  That case is inapplicable because it does not involve an
analysis of claims raised after July 1, 2005, and, therefore, did not involve an analysis under the

law supports that contention, and this court finds the assertion lacks merit.  See also Daniel S. v. Council Rock School Dist., No. 06-3531, 2007 WL 3120014, *2 (E.D. Pa. Oct 25, 2007) ("There is a two-year statute of limitations for the child find provisions under the IDEA.") (citing 20 U.S.C.A. § 1415(f)(3)(c) (2007)).  All Plaintiffs' Child Find claims are based on IDEA and Section 504 and, therefore, the same statutes of limitations apply.

The court adopts the Hearing Officer and Appeals Panel's conclusion that the District did not violate its Child Find obligations.  Therefore, even if the court did not conclude that the Child Find claims are time-barred, in part, Plaintiffs could not prevail on these claims.  IDEA's Child Find duty requires the State have a system in place to identify, locate, and evaluate all children with disabilities residing in the State who have need of special education and related services.  § 1412(a)(3).  See also 34 C.F.R. § 300.125(a); Lauren W. v. Deflaminis, 480 F.3d 259, 275 (3d Cir. 2007) (stating that school districts must adhere to IDEA's Child Find requirements).  Section 504 has a similar requirement.  See 34 C.F.R. § 104.32; W.B. v. Matula, 67 F.3d 484, 500-01 (3d Cir. 1995) (overruled on other grounds).  Pennsylvania fulfills its Child Find duties through a statutory and regulatory scheme codified at 22 Pa. Code §§ 14.121 - 14.124 (2008).

Upon considering considerable evidence regarding the District's Child Find activities and P.P.'s experiences at St. Max since his kindergarten year, the Hearing Officer found, and the Appeals Panel affirmed, that "[t]he Parents' claim that the District violated its Child Find responsibilities to [P.P.] lacks any basis in testimony or documents."  (D.P. Decision 13-14; Appeals Panel Decision 14.)  This court considers that finding to be prima facie correct.  Review shows that the record supports this court's conclusion that the District met its Child Find

---

IDEA-2004 statute of limitations.

obligations.  No nontestimonial extrinsic evidence has been submitted that would warrant a contrary finding.

**E.       Free and Appropriate Public Education ("FAPE")**

Under the IDEA, every disabled student is entitled to a FAPE.  20 U.S.C. § 1400(d)(1)(A-B) (2007).  A school district must develop an IEP for each disabled child, §§ 1412(a)(4), 1414(d), and it must provide a FAPE "in conformity with the [IEP]."  § 1401(9)(D). The Supreme Court recently reviewed the requirements of a FAPE:

> The [IDEA] defines a "free appropriate public education" pursuant
> to an IEP to be an educational instruction "specially designed . . .
> to meet the unique needs of a child with a disability," § 1401(29),
> coupled with any additional " 'related services' " that are "required
> to assist a child with a disability to benefit from [that instruction],"
> § 1401(26)(A).  See also § 1401(9).  The education must, among
> other things, be provided "under public supervision and direction,"
> "meet the standards of the State educational agency," and "include
> an appropriate preschool, elementary school, or secondary school
> education in the State involved."  Id.  The instruction must, in
> addition, be provided at "no cost to parents." § 1401(29).

Winkelman v. Parma City Sch. Dist., 127 S.Ct. 1994, 2001 (2007).

A school district must "conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." §

1414(a)(1)(A).  A district must conduct that evaluation by using "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information . . . that may assist in determining whether the child is a child with a disability."  § 1414(b)(2).  A child must be assessed in all areas of suspected disability.  § 1414(b)(3)(B).

The Hearing Officer and Appeals Panel found that the ER and IEP the District produced in 2005 for P.P. were substantively appropriate and met the requirements of the IDEA.  (D.P. Decision 17, 21; Appeals Decision 15, 17.)  See also § 1414(d) (setting forth the requirements of an IEP); C.F.R. § 300.347(a)(1 - 4).  The court agrees.  Although Plaintiffs disagreed with the ER because it did not identify P.P. has having a learning disability in math computation and no assessment of social/emotional functioning was done, those two areas were not identified as suspected disabilities and thus were properly excluded from the evaluation.  (See Appeals Decision 5.)  Based on the record, the evaluation the District undertook and the ER it provided in 2005 were substantively appropriate, and the IEP offered to P.P. for the 2005-06 school year was reasonably calculated to provide meaningful educational benefit.

## F.     Tuition reimbursement

Plaintiffs seek appropriate tuition reimbursement for P.P.'s placement at Benchmark for the 2005-06 school year, or, in the alternative, full days of compensatory education for each school day during the 2005-06 school year.  (Pls.' Mem. in Supp. of Mot. for J. on the Admin. R. 34.)  This claim is based on Plaintiffs' assertion that the District conducted an inappropriate evaluation and produced an inappropriate independent education plan ("IEP").  (D.P. Decision 3.)  Plaintiffs also seek tuition reimbursement for the 2005 summer program at Benchmark.

The IDEA requires the state to reimburse parents for tuition in some circumstances when

a child was placed in private school without consent or referral of the state.  § 1412(a)(10)©.

> If the parents of a child with a disability, who previously received a
> special education and related services under the authority of a
> public agency, enroll the child in a private elementary school or
> secondary school without the consent of or referral by the public
> agency, <u>a court or a hearing officer may require the agency to
> reimburse the parents for the cost of that enrollment if the court or
> hearing officer finds that the agency had not made a free
> appropriate education available to the child in a timely manner
> prior to that enrollment</u>.

§ 1412(a)(10)(C)(ii) (emphasis added).  The IDEA "does not require a local educational agency
to pay for the cost of education, including special education and related services, of a child with a
disability at a private school or facility if that agency made a free appropriate public education
available to the child and the parents elected to place the child in such private school or facility."
§ 1412(a)(10)(C)(i).  Furthermore, the cost of reimbursement may be reduced or denied, <u>inter
alia</u>, "upon a judicial finding of unreasonableness with respect to actions taken by the parents."
§ 1412(a)(10)(C)(iii).

A student may be entitled to tuition reimbursement if "(1) a court determines the
student's IEP is inappropriate and (2) the student demonstrates that the private placement he
seeks is proper."  <u>Lauren W.</u>, 480 F.3d at 276 (quoting <u>Florence County School District Four v.
Carter ex rel. Carter</u>, 510 U.S. 7, 15 (1993)).  A private placement is proper if it (1) is
appropriate, providing significant learning and conferring meaningful benefit, and (2) is provided

in the least restrictive educational environment.  Id.  The Supreme Court has determined that

retroactive tuition reimbursement is a remedy available to parents where "a court determines that

a private placement desired by the parents was proper under the Act and that an IEP calling for

placement in a public school was inappropriate."  Sch. Comm. of Town of Burlington, Mass. v.

Dep't of Educ., 471 U.S. 359, 370 (1985); see also Ridgewood Bd. of Educ. v. N.E., 172 F.3d

238, 248 (3d Cir. 1999).  "[T]he test for the parents' private placement is that it is appropriate,

and not that it is perfect."  Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir.

1999).  Once a court determines that tuition reimbursement is appropriate, the court may grant

"such relief as the court determines is appropriate, within the meaning of § 1415(e)(2)," and may

take into account equitable considerations.  Burlington Sch. Comm. v. Dep't of Educ., 471 U.S.

359, 374 (1985).  See also Gregory R. v. Penn Delco Sch. Dist., 262 F.Supp.2d 488, 491 (E.D.

Pa.,2003) ("In balancing the equities, . . . we find that the District unreasonably delayed the

initiation of review proceedings by issuing the IEP approximately one year after the parents made

their written request."); Lauren V. v. Colonial Sch. Dist., No. 07-308, 2007 WL 3085854, at *8

(E.D. Pa., Oct 22, 2007) ("If the placement was reasonable, the balance of equities is considered"

for tuition reimbursement); Kevin M. v. Bristol Twp. Sch. Dist.  2002 WL 73233, at *3 (E.D.

PA., Jan 16, 2002) ("The Court interprets the statutory language [of § 1412(a)(10)(C)(iii)] as

permitting it to balance the equities and award, reduce, or deny reimbursement taking into

account all of the circumstances.").

     Last year, the Supreme Court directly addressed the standards for tuition reimbursement

under the IDEA: "[IDEA]'s procedural and reimbursement-related rights are intertwined with the

substantive adequacy of the education provided to a child. . . .  It is . . . out of accord with the

statute's design to interpret the Act to require that parents prove the substantive inadequacy of their child's education as a predicate for obtaining, for example, reimbursement under § 1412(a)(10)(C)(ii).  The adequacy of the educational program is, after all, the central issue in the litigation."  Winkelman v. Parma City Sch. Dist.. 127 S.Ct. 1994, 2004-05 (2007).

The court has determined that both the evaluation the District undertook and the IEP it created for P.P. for the 2005-06 school year met the IDEA standards.  Thus, the education the District offered P.P. was substantively adequate.  Therefore, under the Winkelman standard, Plaintiffs are not entitled to tuition reimbursement for the 2005-06 school year or the Summer of 2005.  The court concurs with the Appeals Panel's observation that "[t]he Parents rushed into a decision about the [private school] well before the time that, under lawful timelines, the District was required to complete an ER and offer an IEP. . . .  By doing so, the Parents negated their claim to tuition reimbursement."  (Appeals Decision 20.)

## G.    Compensatory education

Plaintiffs seek full days of compensatory education from the beginning of the 2002-03 school year through the end of the 2004-05 school year, inclusive of summers.  (Pls.' Mem. in Supp. of Mot. for J. on the Admin. R. 34.)  This claim is based on Plaintiffs' assertion that the District failed to meet its Child Find obligation and/or failed to timely evaluate P.P..  (D.P. Decision 3.)

"A disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education."  Lauren W. v. Deflaminis, 480 F.3d 259, 272 (3d Cir. 2007) (quoting Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 250 (3d Cir. 1999); See Winkelman. 127 S.Ct. at 2004-05 (stating that the right to reimbursement is

predicated on a finding that the child has received an inappropriate education).  As with tuition

reimbursement, compensatory education is only an available remedy when a child is receiving an

inappropriate education.  The right to compensatory education comes from "the denial of an

appropriate education-and not merely the denial of an appropriate IEP."  Ridgewood, 172 F.3d at

250.  Under the IDEA, a student is receiving an inappropriate education if the program is not

providing "significant learning" and conferring a "meaningful benefit."  § 1412(a)(1)(A);  Lauren

W. v. Deflaminis, 480 F.3d 259, 272 (3d Cir. 2007).

The court has found no Child Find violations in P.P.'s case.  Therefore, that purported

basis for compensatory education fails.

The issue of procedural inadequacies remains.  The IDEA does address timeliness.  In the

tuition reimbursement provision, the statute states that the court may award tuition

reimbursement if "the agency had not made a free appropriate education available to the child in

a timely manner prior to [private school] enrollment."  § 1412(a)(10)(C)(ii) (emphasis added).

The IDEA also addresses procedural inadequacies:

> In matters alleging a procedural violation, a hearing officer may
>
> find that a child did not receive a free appropriate public education
>
> only if the procedural inadequacies (I) impeded the child's right to
>
> a free appropriate public education; (II) significantly impeded the
>
> parents' opportunity to participate in the decisionmaking process
>
> regarding the provision of a free appropriate public education to
>
> the parents' child; or (III) caused a deprivation of educational
>
> benefits.

§ 1415(f)(3)(E)(ii).

The Hearing Officer found that the District had failed to issue timely a Permission to Evaluate Form upon Plaintiffs' written request for an evaluation, and she found the District to be "in violation of the unfettered rights of a child to an evaluation upon parental request." (D.P. Decision 14.) She held that the procedural violation went "well beyond de minimus." (Id.) The Hearing Officer engaged in a review of which periods of delay were based on purportedly inappropriate District actions and which others were based on Parent-caused delays. She ultimately determined that P.P. would be awarded 102 hours of compensatory education. (Id. at 15-16.)

The Appeals Panel overturned the Hearing Officer's compensatory education award, finding that the Hearing Officer based the award on a finding that P.P. may have returned to the District during the school year 2004-05. (Appeals Panel 17.) The Appeals Panel emphasized the Hearing Officer's observation that P.P. was "parentally-placed in private schools during the 2004-2005 and the 2005-2006 school years, and precedents exist to suggest that compensatory education is not an available remedy in such circumstances." (D.P. Decision 16; Appeals Panel 18.)

This court finds that the District did take an unduly long time to complete its evaluation. However, the evaluation and the IEP were substantively appropriate, and a procedural violation alone does not suffice to support a compensatory education award. See § 1415(f)(3)(E)(ii). See also, e.g., C.M. v. Bd. of Educ. of Union Cty. Reg'l High Sch. Dist., No. 04-1407, 128 Fed.Appx. 876, 881 (3d Cir., Apr. 19, 2005) ("Other circuits have established that only those procedural violations of the IDEA which result in loss of educational opportunity or seriously

deprive parents of their participation rights are actionable"); Maine Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 19 (1st Cir. 2003) ("compensatory education is not an appropriate remedy for a purely procedural violation of the IDEA"); Erickson v. Albuquerque Pub. Schs., 199 F.3d 1116, 1122-23 (10th Cir.1999) (same); Lesesne v. Dist. of Columbia, 447 F.3d 828, 834 (D.C. Cir. 2006) ("an IDEA claim is viable only if those procedural violations affected the student's substantive rights"). The District's delay in completing its evaluation did not impede P.P. right to a FAPE; the violation did not impede the Parents' opportunity to participate in the decisionmaking process regarding P.P.'s education; and P.P. was not deprived of educational benefits. Id. Therefore, this court cannot award compensatory education, despite the District's procedural violation.

### 3. Reimbursement for the IEEs and vision therapy

#### a. The 2003 and 2005 IEEs

Plaintiffs seek reimbursement for the 2003 and 2005 IEEs that Parents obtained privately due to the District's alleged failure to provide a FAPE to P.P. from the 2002-03 school year through the 2005-06 school year. (Compl. ¶ 1; Pls.' Mem. in Supp. of Mot. for J. on the Admin. R. 34.) A parent has the right to an independent evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency. 34 C.F.R. § 300.502(b)(1); Shaffer v. Weast, 546 U.S. 49, 60 (2005). "IDEA thus ensures parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion. They are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition." Shaffer, 546 U.S. at 60-61.

Plaintiffs are not entitled to reimbursement for the 2003 IEE or the 2005 IEE, both of which they obtained privately.  This court agrees with the Hearing Officer's findings of fact and conclusion regarding the 2003 IEE: "[P.P.]'s first IEE was conducted in April 2003.  The District was not made aware of [P.P.] or his potential eligibility for special education services until November 22, 2004.  Therefore the District is not responsible for reimbursing the Parents for [the 2003] evaluation."  (D.P. Decision 22.)

This court also agrees with the findings of fact and conclusions regarding the 2005 IEE. As the Hearing Officer and the Appeals Panel observed, the Parents had already made an appointment for the 2005 IEE at the time they made a request for a District evaluation.  (F.F. 19-20; Appeals Panel Decision 11.)  As the Appeals Panel wrote,

> the Parents knew the District could and would perform its own evaluation; however they still opted for a private IEE.  As the Hearing Officer stated, obviously the Parents were not challenging the findings of a District ER . . .  [The Hearing Officer] also concluded the IEE was not a frustrated response to waiting an inordinate period of time for the District's ER, as the IEE was commissioned long before the District began down the path to an untimely ER.

(Appeals Panel Decision 11 (citations omitted).  See also D.P. Decision 22.)  This court holds, as the Appeals Panel did before, that "[b]ecause the Parents were not challenging the District's evaluation and because the timing of the IEE reveals that it was not a response to the District's ultimate delayed response," (Appeals Panel Decision 11), the District is not responsible for reimbursing the Parents for the 2005 evaluation.

b.      Vision therapy

Plaintiffs are not entitled to reimbursement for vision therapy services that Parents

obtained privately from July 2003 through March 2004.  Those services were obtained before the District was made aware of P.P.'s potential eligibility for special education services.  In addition, the District had satisfied its child find obligations during the period when the Parents obtained vision therapy for P.P..

## VI.  CONCLUSION

For the aforementioned reasons, the court denies Plaintiffs' motion, grants Defendant's motions, and enters judgment in favor of Defendant on all Plaintiffs' claims.  An appropriate Order follows.